## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WALTER J. LOGAN, JR. and          :
THE DELTA ALLIANCE, LLC,          :
                                  :          CIVIL ACTION
            Plaintiffs,           :
                                  :          No. 10-cv-0144
        vs.                       :
                                  :
SALEM BAPTIST CHURCH OF           :
JENKINTOWN, <u>et al.</u>,             :
                                  :
            Defendants.           :

### <u>MEMORANDUM AND ORDER</u>

**Joyner, J.**                                    **August 22, 2013**

Currently pending before the Court are the Motion for Summary Judgment of Mary Anders and Risa Freeman (ECF No. 73) and the Motion for Summary Judgment of Salem Baptist Church of Jenkintown ("Salem") (ECF No. 74).  For the reasons stated below, the Motion of Anders and Ferman is GRANTED with respect to the state law claims against DA Ferman and DENIED in all other respects, and the Motion of Salem is GRANTED with respect to all claims asserted by The Delta Alliance, LLC ("TDA LLC") and DENIED in all other respects.

## I. BACKGROUND

This action is one of three pending on our docket arising out of what was, and should have remained, a simple contractual dispute between one of the Plaintiffs, Walter J. Logan, and his

1

company, The Delta Organization, Inc. ("Delta"),[1] and the Defendant Salem Baptist Church of Jenkintown ("Salem"). Unfortunately, in an attempt to gain the upper hand in the contractual dispute, Salem and its legal counsel pursued questionable criminal charges against Logan and the late Lester Mack, resulting in their arrests.  After nearly a year, and more than six months after an arbitrator resolved the contractual dispute in Delta's favor, the authorities dropped the criminal charges against both men.

The Plaintiffs subsequently initiated this suit for damages,[2] principally asserting that Salem, its legal counsel, and certain employees of the Montgomery County District Attorney's Office instituted wrongful criminal proceedings without probable cause to do so.  Salem, Montgomery County District Attorney Risa Ferman, and Montgomery County Detective Mary Anders now all move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the Plaintiffs' remaining claims. The record discloses considerable disputed facts and triable

---

[1] Delta is an at-risk construction company, while TDA LLC is a construction and development management firm.  (See Logan Dep. at 9:12-13:4, Pl.'s App. at 250-51.)  Delta no longer performs construction services.  See id.  It is not immediately apparent why TDA LLC is a Plaintiff in this matter instead of Delta.  We address the claims TDA LLC has asserted in its own right infra in section III.C.4.

[2] Mack also initiated a similar lawsuit.  See Estate of Mack v. Salem Baptist Church of Jenkintown, Case No. 10-cv-5536 (E.D. Pa. filed Oct. 20, 2010).

issues, so we will permit the bulk of the Plaintiffs' claims to proceed to trial.

A.  The Construction Contract, the Project, and the Arbitration

In October 2003, Delta and Salem agreed to a guaranteed maximum price ("GMP") construction contract.  (Salem Mot. for Summ. J. Ex. N (the "October 2003 Contract"), § 2.2.)  Delta therefore agreed to serve as an "at-risk" contractor and bore the risk that the cost of completing the construction would exceed the GMP.  See Wyatt, Inc. v. Citizens Bank of Pa., 976 A.2d 557, 560 (Pa. Super. Ct. 2009).

The construction project involved alterations and renovations to vacant buildings adjacent to Salem's premises in Jenkintown, Pennsylvania.  (October 2003 Contract at 1.)  After considerable delays, construction began in earnest late in 2006. (Arbitrator's Award at 2-4, Pl.'s App. at 691-93.)[3]  A dispute soon arose.  Salem apparently believed that Delta misrepresented, in each Application and Certification for Payment (the "AIA Application"), that, as of the date of each AIA Application,

---

[3] An arbitrator issued a comprehensive decision in May 2009 which resolved the parties' numerous disputes arising out of the October 2003 Contract and the project.  (See generally Arbitrator's Award, Pl.'s App. at 690-707.)  Upon Salem's petition to vacate the award, a judge of the Montgomery County Court of Common Pleas confirmed it and entered judgment in favor of Delta.  See Delta Org. v. Salem Baptist Church of Jenkintown, No. 09-18740, Doc. No. 9, 2009 WL 7415943 (Pa. Com. Pl. Sept. 29, 2009) (order denying petition to vacate, confirming award, and entering judgment); see also Delta Org. v. Salem Baptist Church of Jenkintown, No. 09-18740, Doc. No. 17, 10 Pa. D & C. 5th 85 (Pa. Com. Pl. Dec. 22, 2009) (opinion), aff'd 23 A.3d 565 (Pa. Super. Ct. Dec. 2, 2010).

payments to Delta's subcontractors were current.[4]  (Arbitrator's
Award at 4, Pl.'s App. at 693.)  When subcontractors complained
that Delta owed them for work completed months earlier, Salem
concluded that Delta had converted the portion of payments from
Salem properly due to the subcontractors to its own purposes,
then lied about the conversion to Salem.  <u>Id.</u> at 5.  In Delta's
view, Salem typically forced Delta to revise the AIA Applications
one or more times, delaying payment to Delta and the subsequent
payments to the subcontractors, (Logan Dep. at 108:14-110:17,
Pl.'s App. at 274-75), and Salem delayed in approving change
orders for work not contemplated by the original contract and in
excess of the GMP, <u>id.</u> at 127:12-134:10.

Delta and Salem devised a new payment system for AIA
Application 14, which covered work completed between February 1,
2007 and March 31, 2007, as well as two change orders approved

---

[4] Each AIA Application, a standard form produced by the American
Institute of Architects ("AIA"), states, in relevant part as to the contractor
(here Delta), "[t]he undersigned Contractor certifies that to the best of the
Contractor's knowledge, information and belief the Work covered by this
Application for Payment has been completed in accordance with the Contract
Documents, that all amounts have been paid by the Contractor for Work for
which previous Certificates for Payment were issued and payments received from
the Owner, and that current payment shown herein is now due." (<u>E.g.</u>, AIA-14,
Pl.'s App. at 151; AIA-15, Pl.'s App. at 582.)  In addition, each AIA
Application has a certification for the project architect (on behalf of the
architect and Owner, here Salem) which reads "[i]n accordance with the
Contract Documents, based on on-site observations and the data comprising the
application, the Architect certifies that to the best of Ow[ne]r's knowledge,
information and belief the Work has progressed as indicated, the quality of
the Work is in accordance with the Contract Documents, and the Contractor is
entitled to payment of the AMOUNT CERTIFIED." (<u>E.g.</u>, AIA-14, Pl.'s App. at
151; AIA-15, Pl.'s App. at 582.)

during that period.  (AIA-14, Pl.'s App. at 151-153; Letter from

Mack to Tur, May 11, 2007, Pl.'s App. at 452.)  Delta, Salem, and

Salem's construction lender, Citizens Bank, agreed to have

Citizens Bank pay each subcontractor directly through individual

checks, rather than payment through Delta, for all amounts due

each subcontractor through March 31, 2007.[5]  (Arbitrator's Award

at 6-7, 9, Pl.'s App. at 695-96, 699; Logan Dep. at 123:1-23,

131:1-133:6, Pl.'s App. at 278, 280-81; see also Letter from Mack

to Tur, May 11, 2007, Pl.'s App. at 452.)  Citizens Bank made

these "two-party" payments for work completed before March 31,

2007 on or about May 11, 2007.  (Letter from Mack to Tur, May 11,

2007, Pl.'s App. at 452.)

     Delta subsequently submitted AIA Application 15, covering

work completed through April 30, 2007, on May 18, 2007.  (AIA-15,

Pl.'s App. at 582.)  Salem did not pay this application or any of

the three subsequent applications for payment, notwithstanding

that both Delta and the project architect, on behalf of Salem,

---

[5] There is some evidence in the record that this procedure resulted from
Citizens Bank, upon becoming involved in the project as construction lender,
insisting that Delta change the basis for subcontractor payments from the
percentage of completed work to submitted invoices.  (Report of Edward Seglias
at 23, Pl.'s App. at 607; Letter from McCormick to Anders, Sept. 11, 2008 at
1055, Pl.'s App. at 135.)  Of course, the attempt of the Plaintiffs to submit
the "expert" report of Edward Seglias, who has entered an appearance as
counsel for the Plaintiffs in this matter, as evidence is wholly improper, see
Pa. R. Prof. Conduct 3.7, and this Court will not hear purported "expert"
testimony from him or consider any evidence he submits as a purported
"expert."  The only other evidence of such an accounting change appears in a
letter, dated, September 11, 2008, from Logan's counsel, Gerald McCormick, to
Detective Mary Anders.  (Letter from McCormick to Anders, Sept. 11, 2008 at
1055, Pl.'s App. at 135.)

had certified that work billed in the applications was complete.
(Arbitrator's Award at 14-15, Pl.'s App. at 704-705.)  Instead,
by letter dated June 27, 2007, Salem terminated its contract with
Delta, citing non-payment to subcontractors and other perceived
problems with the project.  (Letter from Jonas to Logan, June 27,
2007 at 1057-58, Pl.'s App. at 137-38.)

As a result, Delta filed a claim with the American
Arbitration Association ("AAA") in July 2007 seeking damages for
non-payment under the contract and for wrongful termination of
the contract; Salem counterclaimed, alleging that Delta had
committed fraud by misappropriating payments received from Salem.
(Arbitrator's Award at 13-14, Pl.'s App. at 703-704.)  In March
2009, the arbitration began, and the arbitrator heard
approximately two weeks of testimony.  Delta Org., Inc. v. Salem
Baptist Church of Jenkintown, No. 09-18740, Doc. No. 17, 10 Pa. D
& C. 5th 85 (Pa. Com. Pl. Dec. 22, 2009).

Stephen Wouch, CPA, an accountant Salem engaged to prepare
an analysis of the alleged overpayment, submitted a thorough
expert report to the arbitrator and testified at the arbitration.
(Arbitrator's Award at 14, Pl.'s App. at 704.)  This report ran
to at least 23 pages and contained at least five appendices, and
it concluded that Salem had overpaid Delta by $174,071.  Id.  No
party has submitted this report as part of the summary judgment

record here; instead, we have a three-page report bearing the disclaimer "Preliminary Analysis - For Discussion Purposes Only - Subject to Change" and which, although it has no date and does not bear Wouch's name or signature, appears to be his analysis upon which Delta and the initial criminal investigation relied.[6] (See Summary of Theft/Accounting - Delta Overpayment, Anders & Ferman App. at 187-89; Anders Dep. at 43:7-44:14, Pl.'s App. at 59.)  This "Preliminary Analysis" claims that Salem overpaid Delta by $395,823.79,[7] derived by comparing the $1,973,468.79 Salem paid to Delta with the $1,302,801.50 which Delta paid to its subcontractors and $274,844 to which Delta was entitled as general conditions or contractor's fee.  (Summary of Theft/Accounting - Delta Overpayment, Anders & Ferman App. at 187-89.)  Wouch asserted that this overpayment resulted from Delta's failure to pay $393,515.38 properly due to its subcontractors, composed of $240,661.10 which Salem paid to subcontractors directly through the two-party check system for

---

[6] Apparently the criminal investigation ultimately relied on the later report from Wouch rather than the "Summary of Theft/Accounting - Delta Overpayment."  (See Logan Aff. of Probable Cause at 3, Pl.'s App. at 165.) This Court expresses no view at this time about whether any party is in sanctionable violation of its discovery obligations for failure to produce the later report.

[7] No party has offered any explanation as to why the amounts which appear in the affidavit of probable cause differ so dramatically from those in the "Preliminary Analysis."  (Compare Summary of Theft/Accounting - Delta Overpayment, Anders & Ferman App. at 187-89 with Logan Aff. of Probable Cause at 3-4, Pl.'s App. at 582-84.)

invoices issued before February 1, 2007,[8] and $152,854.28 in
unpaid subcontractor invoices submitted before March 31, 2007.[9]
See id.

In May 2009, the arbitrator issued a thorough and well-
reasoned decision in which he concluded that Salem improperly
terminated the October 2003 Contract, that Salem's counterclaims
lacked merit, and that Delta was entitled to over $150,000 in
damages.  (See generally Arbitrator's Award, Pl.'s App. at 690-
707.)  In particular, the arbitrator concluded that, as of May
2007, all the project's subcontractors had been paid in full for
work completed through March 31, 2007 and billed in AIA-14, id.
at 9, and that Delta never incurred any obligation to pay any of
the subcontractors for work completed and billed after March 31
because Delta never received the payment requested in AIA-15 and
the subsequent applications, id. at 10.  The arbitrator also

---

[8] According to Wouch, these payments were improper because AIA-14
purported to cover work completed between February 1, 2007 and March 31, 2007
and, in Salem's view, certified that Delta had paid what it owed the
subcontractors for work completed prior to February 1, 2007.  (See AIA-14,
Pl.'s App. at 151-53.)  In reality, only one of the AIA-14 payments to a
subcontractor does not align precisely with the amount Delta billed to Salem
for its work in AIA-14, (compare id. with Letter from Mack to Tur, May 11,
2007, Pl.'s App. at 452), and there is no evidence anywhere in the record that
the lone subcontractor who received a discrepant payment had satisfied the
prerequisites to payment prior to the submission of AIA-14 or that the AIA-14
payment did not entirely satisfy Delta's outstanding obligations to this
subcontractor.

[9] Wouch did not enumerate these invoices and did not appear to consider
whether they were subsumed in AIA-15 or another subsequent AIA Application
instead of AIA-14.  (Compare Summary of Theft/Accounting - Delta Overpayment,
Anders & Ferman App. at 187-89 with AIA-15, Pl.'s App. at 582-84.)

expressly disagreed with Wouch's accounting analysis.  Id. at 14.
As a result, the arbitrator concluded that Salem had no factual
or legal basis to believe that Delta had breached either the
October 2003 Contract or any of its subcontracts as of June 2007,
id. at 5, and that Delta was entitled to payment in the amount
certified by Delta and the architect as due, id. at 12 n.17.

B.  The Criminal Investigation and Arrest

In March 2008, after Delta filed the arbitration claim but
before the beginning of the arbitration hearings, Salem's legal
counsel proposed using a "potential criminal claim as leverage
for settlement" of the arbitration claims.  (E-Mail from Caum to
Leopold-Leventhal, Mar. 26, 2008, Pl.'s App. at 708.)  One of
Salem's lawyers, Jane Leopold-Leventhal, presented this strategy
to the members of Salem's Steering Committee in early April 2008.
(E-Mail from Leopold-Leventhal to Page et al., Apr. 11, 2008,
Pl.'s App. at 709.)  Following this meeting, Steering Committee
Member Judge Garrett Page,[10] on behalf of the Steering Committee,
gave Leopold-Leventhal "the green light to approach the DA about
prosecution of Delta."  (E-Mail from Page to Leopold-Leventhal,
May 8, 2008, Pl.'s App. at 710.)

---

[10] At the time, Judge Page was the Treasurer of Montgomery County.
(Page Dep. at 5:8-24, Pl.'s App. at 555.)  Judge Page is now a Judge of the
Montgomery County Court of Common Pleas.  Id.

On May 29, 2008, Judge Page and another of Salem's attorneys, Marc Jonas, met with DA Ferman.  (Ferman Dep. at 46:9-20, Anders & Ferman App. at 76; E-Mail from Page to Jonas and Leopold-Leventhal, May 14, 2008, Pl.'s App. at 711.)  Following the meeting, DA Ferman directed Lieutenant Richard Peffall to assign a detective to investigate the matter.  (E-Mail from Ferman to Peffall et al., May 30, 2008, Pl.'s App. at 232.)  Oscar Vance, the Chief County Detective and a member of Salem, directed Lieutenant Peffal to keep him informed about the investigation because of his affiliation with Salem.  (E-Mail from Vance to Peffall, May 30, 2008, Pl.'s App. at 233 ("Please keep me informed, [t]his is my church.").)

Lieutenant Peffal assigned Detective Anders to investigate.  After a meeting between Lieutenant Peffal, Detective Anders, and Leopold-Leventhal, Leopold-Leventhal reported on the conversation to Judge Page.  (E-Mail from Leopold-Leventhal to Page, June 6, 2008, Pl.'s App. at 712.)  Leopold-Leventhal deliberately excluded other members of the Steering Committee from this report, noting that "[she] did not want to copy everyone on this email, because [she] think[s] it's better that way, for now." Id.  Leopold-Leventhal also recited her belief that Chief Detective Vance's Salem affiliation "can't hurt."  Id.

At the follow-up meeting on June 10, 2008, Leopold-Leventhal provided Lieutenant Peffal and Detective Anders with a binder of pre-prepared material about the dispute between Delta and Salem. (Anders Dep. at 36:13-40:21, Pl.'s App. at 57-58.)  Leopold-Leventhal also reported on this meeting to Judge Page, specifically noting that the two detectives had informed her that they intended to seek certain of Delta's bank records, as well as Logan's personal bank records.  (E-Mail from Leopold-Leventhal to Page et al., June 10, 2008, Pl.'s App. at 713.)

Using the material Leopold-Leventhal provided, Detective Anders began drafting a search warrant application seeking access to Delta's and Logan's bank records.  (Anders Dep. at 48:21-49:5, Pl.'s App. at 60-61.)  The search warrant application recited Wouch's analysis as the basis for believing criminal activity had taken place.  (Compare Search Warrant and Authorization at 11, Pl.'s App. at 129 with Summary of Theft/Accounting - Delta Overpayment, Anders & Ferman App. at 187-89.)  While drafting the search warrant application, Detective Anders sought additional information from Leopold-Leventhal at least once.  (E-Mail from Anders to Leopold-Leventhal, June 17, 2008, Pl.'s App. at 124.)  Near the end of the drafting process, Leopold-Leventhal visited Detective Anders and the assistant district attorney responsible for reviewing the application, Robert Sander, in order, in

Detective Anders' terms, "to help [Sander] get a better understanding of why we believe this is criminal and not civil." (E-Mail from Anders to Leopold-Leventhal, June 30, 2008, Pl.'s App. at 125.)

After the June 30, 2008 meeting and upon completing a draft of the application, Detective Anders sent an electronic copy to Leopold-Leventhal for her review.  Id.  Leopold-Leventhal sent a revised version back to Detective Anders with her alterations highlighted in track changes.  (E-Mail from Leopold-Leventhal to Anders, July 1, 2008, Pl.'s App. at 714.)  Leopold-Leventhal's alterations included factually inaccurate assertions, such as that Salem had paid Delta timely and in full.  (See Anders Search Warrant PC (1).doc at 2905, Pl.'s App. at 716.)

Two weeks later, Leopold-Leventhal inquired about the status of the search warrant.  (E-Mail from Leopold-Leventhal to Anders, July 14, 2008, Pl.'s App. at 719.)  When Detective Anders responded, Leopold-Leventhal forwarded the e-mail exchange to Judge Page, advising him to keep the information confidential. (E-Mail from Leopold-Leventhal to Page, July 14, 2008, Pl.'s App. at 719 ("Let's keep this mum until it's served.  I just wanted to let you know of the good progress.").)  Detective Anders submitted the search warrant application on July 17, 2008, and a

magistrate issued the warrant the same day.  (Search Warrant and Authorization at 8-11, Pl.'s App. at 126-29.)

Following the issuance of the warrant and the acquisition of the bank records, Gerald McCormick, an attorney representing Delta, contacted Detective Anders.  (Letter from McCormick to Anders, July 24, 2008 at 1039-40, Pl.'s App. at 130-31.) McCormick requested that Detective Anders provide him with a copy of her affidavit of probable cause submitted as part of the search warrant application.  Id.  McCormick also offered to provide a copy of the "complete accounting of all funds that [Delta] had received from Salem" which Delta prepared and provided to Salem in connection with the arbitration proceedings.[11]  Id.  McCormick also enclosed a document which he described as a "copy of a Request For Disbursement that the Chairman of Salem's Finance Committee submitted to its construction lender, Citizens Bank, on June 8, 2007, wherein he expressly certified that (1) Delta had fully performed all of its obligations under its contract; (2) all of Delta's subcontractors and suppliers had been paid in full from the proceeds of the previous disbursements; and (3) the proceeds of the requested

---

[11] When asked if she ever requested this "complete accounting," Detective Anders testified, "I don't recall."  (Anders Dep. at 69:18-25, Pl.'s App. at 66.)

disbursement would be paid to Delta."[12]  Id.  Finally, McCormick noted that Delta had never received the payment which Salem requested in the June 8, 2007 letter, notwithstanding that Salem certified Delta's entitlement to the payment.  Id.  Although Detective Anders testified that she forwarded this letter to Sander, nothing in the record indicates whether Sander or Detective Anders formally replied to this letter.[13]

After finally receiving the affidavit of probable cause, McCormick wrote Detective Anders a lengthy letter in which he identified several factual inaccuracies and material omissions. (Letter from McCormick to Anders, Sept. 11, 2008 at 1054-56, Pl.'s App. at 134-36.)  Specifically, McCormick informed Detective Anders that, contrary to the affidavit of probable cause, (1) Salem had terminated the construction contract with Delta, instead of Delta stopping work on the project, (2) Salem had not made "timely and full" payments to Delta, and (3) Salem,

---

[12] In the Plaintiffs' Appendix, only the first page of such a letter appears, and there is no signature page or other basis to identify the author of the letter.  (See Letter from Unknown to Tur, June 8, 2007, Pl.'s App. at 132.)  None of the Defendants has objected to the letter on this basis, so we consider it part of the summary judgment record.

[13] A letter from McCormick to Detective Anders dated August 14 mentions a telephone conversation between the two on July 24, 2008.  (Letter from McCormick to Anders, Aug. 14, 2008, Pl.'s App. at 133.)  Detective Anders testified that, in response to the August 14, 2008 letter, she spoke to McCormick at some point about making Logan available for an interview. (Anders Dep. at 70:16-71:2, Pl.'s App. at 66.)  Detective Anders and McCormick disagree about whether McCormick ever offered to make Logan and Mack available for such interviews.  (Compare Anders Dep. at 70:16-71:2, Pl.'s App. at 66 with McCormick Dep. at 26:24-29:21, Pl.'s App. at 487-88.)  For purposes of this motion, we resolve this dispute in the Plaintiffs' favor.

its architect, and Citizens Bank each inspected Delta's work and
certified that Delta had completed the work billed and had paid
the appropriate parties out of previously billed and paid
amounts.  Id.  McCormick also provided Detective Anders with the
June 27, 2007 letter from Jonas to Logan terminating Salem's
contract with Delta.  (Letter from Jonas to Logan, June 27, 2007
at 1057-58, Pl.'s App. at 137-38.)

During August and September 2008, Detective Anders also
interviewed and corresponded with a former Delta employee who
left Delta's employ in April 2007, Frank O'Donnell.  O'Donnell
speculated that Delta could have over-billed using various
techniques, but he provided no evidence that Delta had ever
actually done so.  (Aug. 14, 2008 Interview Report at 4-6, Pl.'s
App. at 142-44; E-Mail from O'Donnell to Anders, Aug. 25, 2008,
Pl.'s App. at 169-70; E-Mail from O'Donnell to Anders, Sept. 16,
2008, Pl.'s App. at 150.)  Detective Anders forwarded one of the
e-mails from O'Donnell to Leopold-Leventhal suggesting that
"[her] accounting should look at this too," and noting "[i]t
sounds a bit confusing to the 'lay' person/detective!"  (E-Mail
from Anders to Leopold-Leventhal, Sept. 16, 2008, Pl.'s App. at
150.)  It does not appear that O'Donnell ever consulted with
Salem's accounting personnel or that Detective Anders involved
O'Donnell any further during the remainder of the investigation.

The investigation apparently did not progress between September 2008 and December 2008.  In early December, Leopold-Leventhal reported to Judge Page that she had invoked his name in a conversation with Detective Anders.  (E-Mail from Leopold-Leventhal to Page, Dec. 4, 2008, Pl.'s App. at 720 ("I only used your name in the softest way possible with Detective Anders.  It was effective, let's leave it at that.").)  The investigation subsequently began to advance again.  In less than three weeks, Detective Anders had drafted an affidavit of probable cause seeking Logan and Mack's arrest and asked Leopold-Leventhal for help revising it.  (E-Mail from Anders to Leopold-Leventhal, Dec. 22, 2008, Pl.'s App. at 171.)  Detective Anders noted that seeking input from legal counsel for a victim on such a document was unusual.  Id. ("I don't usually ask victims (or their attorneys) help me with the PC!" [sic]).

Detective Anders also interviewed ten subcontractors who had worked on the project.  (Sub-Contractors Dec. 2008 at 819-822, Pl.'s App. at 154-57.)  In her summary of these interviews, Detective Anders noted that all had complained about untimely payments and that Delta had never fully paid several of them. Id.  Detective Anders' summary did not identify whether the unpaid invoices the subcontractors mentioned covered work completed between March 31, 2007 and Salem's termination of the

October 2003 Contract in June 2007 and for which Salem had never paid Delta.[14]  See id.

Detective Anders finished the affidavit of probable cause and submitted it for review by two assistant district attorneys, Sander and Steven Latzer.  (Anders Dep. at 149:22-150:12, Pl.'s App. at 86.)  The record does not disclose whether Sander or Latzer recommended any substantive changes to the affidavit, nor does it contain any evidence that Sander or Latzer had any information about the investigation other than what Detective Anders chose to present in the affidavit.  See id. at 146:18-150:12, 190:20-198:25.

The final version of the affidavit of probable cause, like the search warrant application before it, relied on Wouch's analysis both with respect to the claimed overpayment and the non-payment to the subcontractors.  (Compare Logan Aff. of Probable Cause at 3-4, Pl.'s App. at 165-66 with Summary of Theft/Accounting - Delta Overpayment, Anders & Ferman App. at 187-89.)  It also invoked Delta's submission of AIA Applications 15, 16, and 17 for work completed between March 31, 2007 and June

---

[14]  Detective Anders also later testified that she did not know during the course of the investigation that the two-party system checks issued on May 11, 2007, made all subcontractors current on payments due for work completed through March 31, 2007 and that she did not understand how the payments associated with AIA Application 14 had been calculated.  (Anders Dep. at 83:9-86:14, Pl.'s App. at 69-70.)

22, 2007[15] as well as the reallocation of certain never-billed construction budget items from the category "multi-purpose building" to other line items in the construction budget.  (See Logan Aff. of Probable Cause at 3-4, Pl.'s App. at 165-66.) Detective Anders signed the affidavit under oath on January 13, 2009.  (Logan Aff. of Probable Cause at 6, Pl.'s App. at 168.)[16]

At some point on or before January 13, the decision was made to arrest Logan and Mack on January 14.  Leopold-Leventhal apparently knew on January 12 that the arrests would take place during that week.  (E-Mail from Leopold-Leventhal to Spare et al., Jan. 12, 2009, Pl.'s App. at 721.)  The same day, she also sent a lengthy e-mail to Judge Page and others, "confirm[ing] [that] all the papers, warrants [are] signed and ready to go" and noting that the arrests would likely benefit Salem's case in the arbitration.  (E-Mail from Leopold-Leventhal to Page et al., Jan. 12, 2009, Pl.'s App. at 722.)  Leopold-Leventhal also wrote, of the arrests, "I would expect to see something in the paper in the next few days," id., and referred to a private, ex parte

---

[15] Although only AIA Application 15 is in the record, the arbitrator determined that AIA Applications 16 and 17 also encompassed work completed before Salem terminated the contract with Delta.  (Arbitrator's Award at 15, Pl.'s App. at 705.)

[16] A later version of the affidavit, signed and dated January 26, 2009, also contains information about Mack's criminal history.  (Salem Mot. for Summ. J., Ex. I (the "Jan. 26 Aff.") at 6.  The affidavit is otherwise identical to the affidavit Detective Anders signed on January 13, 2009 in support of the arrest warrants for Logan and Mack.  (Compare Logan Aff. of Probable Cause at 1-6, Pl.'s App. at 163-168 with Jan. 26 Aff. at 1-7.)

conversation between her and DA Ferman in which DA Ferman shared, among other information, non-public details about her conversation with Delta's legal counsel,[17] id.

According to Sander, the arrest date was chosen because "[Sander] found out [on January 13] that the Salem Baptist Church would have to put up $30,000 for arbitration unless we made arrests against the princip[al]s of the Delta Organization before Thursday [January 15, 2009] so we decided to do it tomorrow." (E-Mail from Sander to Ferman, Jan. 13, 2009, Pl.'s App. at 236.) Nothing in the record suggests who else participated in this decision, but Detective Anders signed and submitted the criminal complaint against Logan before a magisterial district judge that day. (Criminal Complaint at 726-29, Pl.'s App. at 159-62; Logan Aff. of Probable Cause at 1-6, Pl.'s App. at 163-68.)

Sander also prepared a draft press release, (E-Mail from Sander to Ferman, Jan. 13, 2009, Pl.'s App. at 236), and coordinated with at least one reporter about covering the arrest and interviewing DA Ferman about the case, (E-Mail from Sander to Durante, Jan. 13, 2009, Pl.'s App. at 237). Immediately after Sander corresponded with the reporter, he wrote to DA Ferman to

---

[17] DA Ferman denies that any such conversation took place. (Ferman Dep. at 132:5-22, Pl.'s App. at 212.) Leopold-Leventhal's e-mail suggests otherwise. (E-Mail from Leopold-Leventhal to Page et al., Jan. 12, 2009, Pl.'s App. at 722 ("I just spoke with the DA and she was floored that there are existing arrest warrants for [Mack].").) Construing the record in the light most favorable to the Plaintiffs, we resolve this factual dispute in the Plaintiffs' favor for purposes of this motion.

inform her that Logan and Mack would be arrested the next day.
(E-Mail from Sander to Ferman, Jan. 13, 2009, Pl.'s App. at 236.)

Following Logan's arrest, DA Ferman decided against issuing
a press release, stating "I do not want us to call attention to
it."  (E-Mail from Ferman to Sander, Jan. 14, 2009, Pl.'s App. at
236.)  Notwithstanding this professed desire, DA Ferman gave a
number of interviews to reporters.  In one interview, DA Ferman
stated,

> "[u]nfortunately, we see a lot of cases
> involving contractors ripping off consumers
> and while we take all these cases seriously,
> it is particularly despicable and outrageous
> to steal from a church . . . .  Construction
> projects are an enormous amount of work for a
> church and it is always extremely difficult
> for them to raise funds for them.  Mr. Logan
> was entrusted by the church with overseeing a
> major construction project and he took money
> from them and he hired people to do work.
> Then he ripped off his subcontractors, never
> paid them and pocketed the money for himself.

(Larry Miller, "Contractor Accused of Church Fraud," Phila.
Tribune, Jan. 16, 2009, at 1-A, 5-C, Pl.'s App. at 245-46; see
also "Contractor Accused of Ripping Off Jenkintown Church," KYW
Newsradio Jan. 14, 2009, Posted 1:03 PM, Pl.'s App. at 241-42.)[18]
DA Ferman later testified that these articles probably quoted her

---

[18] At least two other articles also appeared without direct quotations
from DA Ferman; instead, these pieces appear to have relied on the affidavit
of probable cause for their factual statements.  (See Keith Phucas,
"Construction Contractor Accused of Deceptive Practices," The Times Herald,
Jan. 19, 2009, Anders & Ferman App. at 219-20; Derrick Nunnally, "Contractor
Charged with Defrauding Church," Phila. Inquirer, Jan. 19, 2009, Anders &
Ferman App. at 221.)

correctly and "may have been part of what I would have said to someone." (Ferman Dep. at 89:4-5, 93:9-11, Pl.'s App. at 202-203.) She further testified that she typically made such comments to reporters as part of a longer discussion including disclaimers about the pending and unresolved nature of the charges. (Ferman Dep. at 88:16-94:3, Pl.'s App. at 201-203.)

C.  The Post-Arrest Proceedings

Following the arrests, both Logan and Mack sought habeas corpus relief in the Court of Common Pleas, arguing that the Commonwealth had failed to establish probable cause supporting the charges against them. (Salem Mot. for Summ. J., Ex. K (the "Criminal Docket Entries") at 1-11.) Before the habeas corpus hearing, Detective Anders, Sander, and Leopold-Leventhal corresponded about the interplay between the arbitration proceedings and the criminal proceedings.[19] (E-Mail from Anders to Leopold-Leventhal, Apr. 17, 2009, Pl.'s App. at 178.) Detective Anders wrote to Leopold-Leventhal, of the arbitrator's decision, "[l]et's hope the decision doesn't come in before the habeas in case it doesn't go in the Church's favor."[20] Id.

---

[19] The record does not satisfactorily explain Leopold-Leventhal's continued involvement in this matter after January 27, 2009. On January 27, 2009, she and her law firm withdrew as Salem's counsel in the arbitration proceedings. Delta Org. v. Salem Baptist Church of Jenkintown, No. 09-18740, Doc. No. 17, 10 Pa. D & C. 5th 85, 2009 WL 6022140, at 1 n.2 (Pa. Com. Pl. Dec. 22, 2009) (opinion), aff'd 23 A.3d 565 (Pa. Super. Ct. Dec. 2, 2010).

[20] The judge ultimately denied habeas corpus relief on August 31, 2009. (Criminal Docket Entries at 8.)

The arbitration concluded in May 2009 with an award in Delta's favor.  (See generally Arbitrator's Award, Pl.'s App. at 690-707.)  In August 2009, assistant district attorney Christopher Parisi replaced Sander as the assistant district attorney assigned to the criminal case against Logan and Mack. (E-Mail from Parisi to Vance, Aug. 29, 2009, Pl.'s App. at 480.) At that time, Parisi reported to Chief Detective Vance that "[g]iven the result of the civil arbitration in the case, we are presented with some difficulties in our criminal prosecution.  As [Latzer] and I work through the case, [Parisi] will keep [Vance] in the loop on what we decide."  Id.  Parisi also stated that he planned "to resolve the cases quickly, hopefully within a week or two."  Id.  Although he later testified that he had recused himself from the matter, (Vance Dep. at 33:10-16, Pl.'s App. at 467), Vance replied to Parisi that "[t]he case is a theft but it is going to be difficult to prosecute if the results of the civil case can be used in the criminal case."  (E-Mail from Vance to Parisi, Aug. 31, 2009, Pl.'s App. at 480.)

The criminal case remained pending through September 2009, at which time McCormick sent multiple letters to Parisi inquiring about the status of the charges against Mack.  (E-Mail from Anders to Parisi, Oct. 2, 2009 at 1368, Pl.'s App. at 176.) Detective Anders drafted an assessment of McCormick's assertions

for Parisi to consider and asked Leopold-Leventhal to review it.
(E-Mail from Anders to Leopold-Leventhal, Oct. 2, 2009, Pl.'s
App. at 172.)  Leopold-Leventhal agreed and sent back a revised
version; it is not clear how extensively Leopold-Leventhal
revised the document.  (See [M]c[C]ormick response.doc at 1757-
58, Pl.'s App. at 174-75.)  Detective Anders copied and pasted
the revised document she received from Leopold-Leventhal into an
e-mail to Parisi, retaining the formatting from the attached
document.  (See E-Mail from Anders to Parisi, Oct. 2, 2009 at
1368-69, Pl.'s App. at 176-77.)  The response largely repeated
the allegations in the affidavit of probable cause and cited no
new information uncovered during the preceding ten months to
support the charges.  See generally id.

McCormick continued to ask Parisi about the progress of the
criminal case against Mack throughout the fall of 2009.
(McCormick Dep. at 52:18-53:18, Pl.'s App. at 493-94.)  In
November 2009, Parisi informed McCormick that Latzer was delaying
the dismissal of the charges.[21]  Id. at 53:9-18.  Latzer, in
turn, told McCormick that, "had [Latzer] been involved in this
case from the get-go the charges would never have been filed,"[22]

---

[21] Notwithstanding that no party had objected to these statements, we note that we may consider these hearsay statements of Parisi because they tend to show his plan to dismiss the criminal charges.  See Fed. R. Evid. 803(3).

[22] Latzer's hearsay statements are admissible on the same basis as Parisi's.  See note 21, supra.

id. at 53:19-54:4, and that "something above him" was holding up the dismissal of the criminal charges, id. at 54:22-55:5.

No action took place in the criminal matter through December 2009.  On January 6, 2010, Parisi filed a motion for nolle prosequi of all the charges against Logan and Mack.  (Criminal Docket Entries at 10.)  The motion came three days after Judge Page was sworn in as a Judge of the Court of Common Pleas.  (Page Dep. at 5:8-13, Pl.'s App. at 555.)

D.  This Action

Shortly after the dismissal of the criminal charges, the Plaintiffs filed this action.  As relevant to this motion, the Plaintiffs assert two 42 U.S.C. § 1983 claims, one against Detective Anders for false arrest and one against DA Ferman for making false public statements.  The Plaintiffs also assert state law claims for civil conspiracy against all Defendants, malicious prosecution against Detective Anders and Salem, malicious abuse of process against Detective Anders and DA Ferman, and defamation, false light invasion of privacy, and commercial disparagement against DA Ferman.[23]

**II.  STANDARD**

---

[23] The Plaintiffs asserted other state law claims against Salem, Detective Anders, DA Ferman, and other named Defendants which this Court dismissed upon certain Defendants' motions to dismiss, and the Plaintiffs have settled their claims against certain other Defendants.  This ruling only addresses the remaining pending claims.

Upon considering a motion for summary judgment, the Court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (alteration in original) (internal quotation marks omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleading; its response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (alteration in original) (internal quotation marks omitted).

## III.  DISCUSSION

### A.   Detective Anders

As relevant to Detective Anders, the Plaintiffs assert claims for: (1) § 1983 false arrest, (2) malicious prosecution, (3) abuse of process, and (4) civil conspiracy.  Triable issues

exist as to all four claims, so summary judgment is not proper in Detective Anders' favor on any of them.

1.   Section 1983 Unlawful Arrest

A court evaluating a § 1983 claim for unlawful arrest considers "whether the arresting officers had probable cause to believe that the person arrested had committed the offense." Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995) (internal quotations omitted).  Probable cause exists when the facts and circumstances within the arresting officer's knowledge suffice to establish a reasonable belief that the individual has committed or is committing a criminal offense.[24]  Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir. 2003).  "Generally, the question of probable cause in a section 1983 damage suit is one for the jury," particularly when credibility conflicts exist. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000) (internal quotations omitted); see also Clifton v. Borough of Eddystone, 824 F. Supp. 2d 617, 623 (E.D. Pa. 2011).

Where a warrant precedes the challenged arrest, the "arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest."  Wilson v.

---

[24]   Detective Anders has argued that the honesty and sincerity of her belief that Logan had committed a crime proves that probable cause existed and absolves her from civil liability.  This argument overlooks the requirement that, to establish probable cause, a belief that criminal activity has taken place must be reasonable.

Russo, 212 F.3d 781, 786 (3d Cir. 2000).  Instead, "a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause."[25]  Id. (internal quotations omitted).

What constitutes "reckless disregard" for the truth in an application for an arrest warrant differs based on whether the application omits certain facts or affirmatively misrepresents them.  Id. at 787.  "[O]missions are made with reckless disregard if an officer withholds a fact in his ken that [a]ny reasonable person would have known that this was the kind of thing the judge would wish to know."  Id. at 788 (internal quotations omitted).  "An assertion is made with reckless disregard when viewing all

---

[25] The Court of Appeals has stated that, when evaluating whether a plaintiff has made a sufficient showing on these two points to survive a motion for summary judgment, we do not apply the typical summary judgment method of construing all facts in the light most favorable to the plaintiff.  Reedy v. Evanson, 615 F.3d 197, 214 n.24 (3d Cir. 2010).  We conclude that Reedy mandates that we perform the two-step Wilson analysis without drawing all inferences in the non-moving party's favor, then, in determining all other relevant matters, apply the familiar summary judgment standard of drawing all inferences in the non-movant's favor.  Compare Reedy, 615 F.3d at 214 n.24 with id. at 216.  Although this limited carve-out from the overarching Rule 56 standard is puzzling, difficult to apply, and finds nothing to mandate it in either Wilson or the text of Rule 56, the Court of Appeals has spoken on the matter, and we follow the law as that Court has stated it.

the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  Id. (internal quotations omitted).

    a.  False statements in affidavit of probable cause

    Here, a reasonable juror could conclude that Detective Anders acted with reckless disregard for the truth in making false statements and omissions in her affidavit of probable cause.  First, a jury could conclude that Detective Anders falsely stated in the affidavit that Delta's certification on the AIA Application "certified . . . the . . . payments to the sub-contractors were current and up to date."  (Logan Aff. of Probable Cause at 1, Pl.'s App. at 163.)  The AIA Application only certifies that Delta had made payments to subcontractors for work which (1) Delta had certified as completed to Salem in a previous AIA Application and (2) Salem had paid Delta in accordance with such a previously submitted AIA Application.  See id.  Detective Anders testified that she understood that Delta had no obligation to pay subcontractors until Delta received payment from Salem, (Anders Dep. at 134:9-135:25, Pl.'s App. at 82); a reasonable juror could conclude that, based on this admitted understanding, she had obvious reason to doubt the truth of the assertion she made in the affidavit.

In discussing Delta's certification, a jury could also conclude that Detective Anders recklessly omitted the presence of the architect's certification on the AIA Applications.  (Logan Aff. of Probable Cause at 1, Pl.'s App. at 163.)  On each AIA Application, the architect certified, on behalf of the "Owner," Salem, that the architect, acting on behalf of Salem, had reviewed the AIA Application and supporting documents, conducted a site review, and concluded that Salem must pay Delta for work already completed. (See, e.g., AIA-14, Pl.'s App. at 151.) Because the crimes charged against Logan and Mack involved false or deceptive statements and conduct, any reasonable magistrate evaluating the affidavit would wish to know that Salem had an independent observer, the architect, overseeing Delta's applications for payment and certifying their accuracy.

The architect's certification also means that a reasonable juror could conclude that Detective Anders had obvious reasons to doubt certain of her other statements in the affidavit.  The architect's certification gives an obvious reason to doubt Detective Anders' statement that Salem relied exclusively on Delta for the accuracy of the information in the AIA Applications because the architect also certified the truth of the information contained in the AIA Applications.  (Logan Aff. of Probable Cause at 2, Pl.'s App. at 164.)  And the architect's certification

gives an obvious reason to doubt the assertion that "the total amount [Salem] should have paid was $1,600,189," id. at 3, because the architect, on behalf of Salem, certified that $2,117,231 worth of work had been completed as of March 31, 2007, entitling Delta to $1,944,255 in total payments from Salem,[26] (see AIA-14, Pl.'s App. at 151).

A jury could also conclude that Detective Anders recklessly omitted from the affidavit the terms and conditions of payment contained in the contracts between Delta and its subcontractors. (See Logan Aff. of Probable Cause at 5, Pl.'s App. at 167.) Although the subcontractors had to satisfy any such conditions prior to becoming entitled to payment, and although the arbitrator described these conditions as "draconian," (Arbitrator's Award at 6, Pl.'s App. at 695), Detective Anders omitted any discussion of such conditions from the affidavit. Nor did Detective Anders attempt to discern whether any of the subcontractors had satisfied the terms of their contracts with

---

[26] The most likely cause for the discrepancy between the amount Delta was entitled to from Salem, some $1.9 million, and the amount Delta paid its subcontractors and billed as general conditions and contractor's fee, some $1.6 million, appears to be some combination of inconsistent project accounting and Delta billing Salem based on the percentage of budgeted work completed instead of the value of invoices which subcontractors had submitted. (See E-Mail from O'Donnell to Anders, Aug. 25, 2008, Pl.'s App. at 169-70; Letter from McCormick to Anders, Sept. 11, 2008 at 1054-56, Pl.'s App. at 134-36.) Whatever the source of the discrepancy, we conclude the architect's certification provides obvious reason to doubt that Delta had billed Salem improperly or actually rendered services entitling it to less than $1.9 million in payment.

Delta entitling them to payment.  (See Logan Aff. of Probable
Cause at 4-5, Pl.'s App. at 166-67.)  Detective Anders testified
that she did not know if she ever reviewed the contracts between
Delta and the subcontractors, (Anders Dep. at 112:16-20, Pl.'s
App. at 76), and that she did not rely on any such contracts in
drafting the affidavit, id. at 99:17-100:4.  Because the
affidavit of probable cause alleged criminal conduct based on a
discrepancy between amounts paid from Salem to Delta and amounts
Delta paid to its subcontractors, any reasonable magistrate
assessing the affidavit would wish to understand the terms under
which Delta agreed to pay its subcontractors and whether the
purportedly unpaid subcontractors had satisfied those terms.

        Finally, a reasonable juror could conclude that Detective
Anders had obvious reason to doubt her assertion that Salem
remitted "timely and full" payments to Delta.  (Logan Aff. of
Probable Cause at 2, Pl.'s App. at 164.)  The evidence shows that
Detective Anders knew that Salem last paid Delta based on AIA
Application 14, covering work completed through March 31, 2007,
and that Delta continued to work between March 31, 2007 and the
termination of the construction contract in June 2007.[27]  (Anders
Dep. at 135:9-137:8, Pl.'s App. at 82-83.)  The evidence further

------

        [27]  To the extent that the affidavit asserts that the submission of AIA
Applications 15, 16, and 17 was in any way improper, Detective Anders'
testimony to this effect would permit a jury to conclude that she had obvious
reason to know the falsity of such an assertion.

shows that Delta submitted AIA Applications 15, 16, and 17, each with a proper certification that Delta had completed the billed work from the architect acting on Salem's behalf, seeking payment for work completed during this period and that Salem did not pay based on these Applications.  (Arbitrator's Award at 15, Pl.'s App. at 705.)  And the evidence shows that Detective Anders knew that Salem did not pay based on AIA Application 14 until May 11, 2007, more than six weeks after it was submitted.  (Logan Aff. of Probable Cause at 2, Pl.'s App. at 164 (citing Letter from Mack to Tur, May 11, 2007, Pl.'s App. at 452).)  This evidence presents obvious reason to doubt the assertion that Salem remitted timely and full payments to Delta.

    b.  Probable cause based on reconstructed affidavit

    A jury could further conclude that these false assertions and omissions were material to the probable cause determination. One could reasonably conclude that "at the time the arrest was made, the facts and circumstances within [Detective Anders'] knowledge were not sufficient to warrant a prudent man in believing that [the suspect] had committed . . . an offense." See Reedy v. Evanson, 615 F.3d 197, 223 (3d Cir. 2010) (internal quotations omitted).

    The affidavit requested an arrest warrant for six crimes: (1) theft by unlawful taking or disposition, 18 Pa. Cons. Stat. §

3921(a); (2) theft by deception, 18 Pa. Cons. Stat. § 3922(a);
(3) theft by failure to make required disposition of funds
received, 18 Pa. Cons. Stat. § 3927(a); (4) deceptive business
practices, 18 Pa. Cons. Stat. § 4107(a)(2); (5) misapplication of
entrusted property, 18 Pa. Cons. Stat. § 4113(a); and (6)
securing execution of documents by deception, 18 Pa. Cons. Stat.
§ 4114.  Each of these crimes requires proof a materially false
statement or representation, <u>see</u> 18 Pa. Cons. Stat. §§ 3922(a),
4107(a)(2), 4114, or a duty to dispose of funds in a certain way,
<u>see</u> 18 Pa. Cons. Stat. §§ 3921(a), 3927(a), 4113(a).  Because a
jury could conclude that the false statements and omissions
discussed above were material to finding of probable cause to
believe that Logan had made a false statement or omission,
engaged in deceptive conduct, or defied any obligation to dispose
of funds in a certain manner, summary judgment is not proper in
Detective Anders' favor.[28]

   i.  False statements or deceptive conduct

---

[28] To the extent that Detective Anders claims that the decision of Judge
Rogers of the Court of Common Pleas to deny habeas corpus to Logan and Mack
requires a conclusion that probable cause to arrest Logan and Mack existed as
a matter of law, the argument has no merit.  "[T]he common law presumption
raised by a magistrate's prior finding that probable cause exists does not
apply to section 1983 actions."  <u>Merkle</u>, 211 F.3d at 789.  Moreover,
Pennsylvania law contains no such common law presumption at all.  <u>See Cosmas
v. Bloomingdale's Bros., Inc.</u>, 442 Pa. Super. 476, 484, 660 A.2d 83 (1995)
(internal citations omitted) ("[A] holding over is to be considered along with
all of the other evidence offered by the parties on the issue of probable
cause.").

Were a jury to conclude that Detective Anders made the material false statements and omissions in the affidavit discussed above, it could similarly conclude that no probable cause existed to believe that Logan had acted deceptively in his relationship with Salem.  If corrected to remove these deficiencies upon such a finding by a jury, the affidavit would show no overpayment to Delta and would merely recite some evidence of delayed payment from Delta to the subcontractors which might or might not have resulted from Salem's failure to pay Delta in a timely fashion.[29]  The corrected affidavit would also recite that Delta had never paid many of the subcontractors in full, and that this failure might or might not have resulted from Salem's failure to pay Delta based on AIA Applications 15, 16, and 17.[30]  A jury could conclude that this evidence would not suffice for an prudent person to believe that Logan had made any false statement or acted deceptively.

---

[29] So viewed, the fact that Wouch had purportedly "discovered" $498,095, some of which Salem paid directly to subcontractors, (see Logan Aff. of Probable Cause at 3, Pl.'s App. at 165), shows nothing criminal; if Delta properly billed for services rendered entitling it to $1.9 million in payment, then the mechanism of payment to the subcontractors does not warrant a belief that Logan made any false statement or acted deceptively.

[30] Viewed in this light, Wouch's similar "discovery" of the remainder of the $498,095 still owed to subcontractors, (see Logan Aff. of Probable Cause at 3, Pl.'s App. at 165), bears no indicia of criminality; Salem's failure to pay Delta sufficiently explains Delta's outstanding subcontractor bills such that an ordinary, prudent person would require more in order to believe that Logan had acted in a criminally deceptive manner.

The corrected affidavit would also recite the reallocation
of certain never-billed construction budget items from the
category "multi-purpose building" to other line items in the
construction budget.  (See Logan Aff. of Probable Cause at 3-4,
Pl.'s App. at 165-66.)  Without showing that this labeling change
meant that Delta secretly no longer intended to construct the
multi-purpose building or otherwise attempted to deceive Salem by
means of this reallocation, a reasonable juror could conclude
that the corrected affidavit would not permit a prudent person to
believe that Logan criminally prevaricated or deceived Salem.

Because a jury could conclude that the corrected affidavit
does not permit a prudent person to conclude that Logan engaged
in false or deceptive conduct in his relationship with Salem, it
follows that a jury could conclude that Detective Anders lacked
probable cause to believe that Logan had committed theft by
deception, deceptive business practices, or securing execution of
documents by deception.  See 18 Pa. Cons. Stat. §§ 3922(a),
4107(a)(2), 4114.

ii.  Duty to disperse funds

Were a jury to conclude that Detective Anders made the
material false statements and omissions in the affidavit
discussed above, it could similarly conclude that no probable
cause existed to believe that Logan had violated an obligation to

dispense the funds Delta received from Salem to the subcontractors.  The corrected affidavit would note that Delta had no contractual duty to pay its subcontractors until the subcontractors had fulfilled the terms and conditions of their contracts with Delta, and it would not mention any evidence that any subcontractor which had satisfied such terms failed to receive payment.  Based on this evidence, a reasonable juror could conclude that no probable cause existed to believe that Logan defied any contractual duty to pay Delta's subcontractors.

Moreover, the corrected affidavit would not mention any evidence that Delta and its subcontractors had anything other than arm's length contractual relationships.  Based on this evidence, a reasonable juror could conclude that no probable cause existed to believe that Logan defied any extra-contractual duty to pay Delta's subcontractors.

Because a jury could conclude that the corrected affidavit does not permit a prudent person to conclude that Logan had violated any obligation to disburse money he received from Salem, it follows that a jury could conclude that Detective Anders lacked probable cause to believe that Logan had committed theft by unlawful taking or disposition, theft by failure to make required disposition of funds received, or misapplication of

entrusted property.[31]  <u>See</u> 18 Pa. Cons. Stat. §§ 3921(a),
3927(a), 4113(a).

    c.  Qualified Immunity

    Finally, Detective Anders is not entitled to summary
judgment based on qualified immunity.  Viewed in the light most
favorable to the Plaintiffs, "no reasonably competent officer
would have concluded that a warrant should issue" on the facts we
have already recited above.  <u>See Reedy</u>, 615 F.3d at 224.[32]  To
the extent that Detective Anders argues that she is entitled to
qualified immunity as a matter of law because two assistant
district attorneys reviewed and approved her affidavit of
probable cause, the law is to the contrary.[33]  <u>See Hector v.
Watt</u>, 235 F.3d 154, 164 (3d Cir. 2000) (quoting <u>Jones v. City of
Chicago</u>, 856 F.2d 985, 994 (7th Cir. 1988) (Posner, J.) ("[A]

---

[31]  To the extent that Detective Anders argues that the affidavit alleges
a violation of these criminal statutes by means of billing in excess of the
amount to which Delta was entitled, a jury could conclude that the corrected
affidavit, taking into account the architect's certification, would not
establish any such over-billing and that probable cause on such a theory did
not exist.

[32]  The <u>Reedy</u> Court also noted that "qualified immunity exists, in part,
to protect police officers in situations where they are forced to make
difficult, split-second decisions. . . .  There were no 'split-second'
decisions made in this case."  615 F.3d at 224 n.37.  We conclude the same
here.  The conduct which formed the basis for criminal charges all took place
during 2007, but Detective Anders did not file the affidavit of probable cause
seeking an arrest warrant until January 2009.

[33]  The fact that a jury could conclude that Detective Anders made
materially false statements and omitted material facts in the affidavit of
probable cause distinguishes this matter from <u>Messerschmidt v. Millender</u>, 132
S. Ct. 1235 (2012); in that matter, "[t]here [was] no contention . . . that
the affidavit was misleading."  132 S. Ct. at 1245 n.2.

prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial — none of these decisions will shield a police officer who deliberately supplied misleading information that influenced that decision.")); see also Robinson v. Jordan, 804 F. Supp. 2d 203, 209 n.6.  Of course, this decision on qualified immunity as to the false arrest claim against Detective Anders "is solely that [qualified immunity] is not warranted at the summary judgment stage in this case.  Qualified immunity remains a viable defense, though its applicability cannot be finally determined until after the facts have been sorted out at trial."[34]  Id. at 224 n.38.

2.  Malicious Prosecution

For the Plaintiffs to succeed on a claim for malicious prosecution under Pennsylvania law, they must show:  (1) the Defendants initiated a criminal proceeding against the Plaintiffs; (2) the criminal proceeding terminated in the Plaintiffs' favor; (3) probable cause to commence the criminal proceeding did not exist; and (4) the Defendants acted with malice or for a purpose other than bringing Plaintiffs to

---

[34]  To the extent that Detective Anders claims that the decision of Judge Rogers of the Court of Common Pleas to deny habeas corpus to Logan and Mack requires a conclusion that she is entitled to qualified immunity, we reject the argument because, as stated above, material factual disputes exist about the underlying facts which preclude a conclusion about Detective Anders' entitlement to qualified immunity at this time.

justice.  Doherty v. Haverford Twp., 513 F. Supp. 2d 399, 409
(E.D. Pa. 2007).  "Malice may be inferred from the absence of
probable cause."  Kelley v. Gen. Teamsters, Chauffeurs, and
Helpers, Local Union 249, 518 Pa. 517, 521, 544 A.2d 940 (1988).
"Usually, the existence of probable cause is a question of law
for the court rather than a jury question, but may be submitted
to the jury when facts material to the issue of probable cause
are in controversy."[35]  Id.

Detective Anders argues that summary judgment is proper on
this claim because probable cause existed to initiate the
criminal proceedings and because she acted without malice.  As
discussed above, triable issues of fact exist about whether
Detective Anders made materially false or misleading statements
or omissions which, if proven, would permit this Court to
conclude that she lacked probable cause to initiate the criminal
proceedings.  Moreover, such a determination would permit a jury
to infer the presence of malice.  Because triable issues of fact
therefore remain on both elements of the malicious prosecution
claim, summary judgment is not proper.

3.  Abuse of process

_____

[35] This principle for evaluating the Pennsylvania state law claims
differs from the principle applicable to the § 1983 claims, where probable
cause is a question of fact.  Clifton, 824 F. Supp. 2d at 634 n.7.

To recover on an abuse of process claim under Pennsylvania law, Plaintiffs must show that Defendants "(1) used a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." Harris v. Brill, 844 A.2d 567, 572 (Pa. Super. Ct. 2004) (internal quotations omitted). Detective Anders argues that summary judgment is proper on this claim because no evidence exists that she used process primarily to benefit Salem or for any purpose other than to achieve justice.  This record would permit a jury to conclude that Salem's legal counsel created the strategy of approaching the Montgomery County District Attorney's Office not for purposes of bringing Logan and Mack to justice but, instead, to use criminal proceedings "as leverage for settlement of a judgment," (E-Mail from Caum to Leopold-Leventhal, Mar. 26, 2008, Pl.'s App. at 708), and that Salem implemented this strategy, (E-Mail from Page to Leopold-Leventhal, May 8, 2008, Pl.'s App. at 710).  The record further shows extensive cooperation between Salem's legal counsel and Detective Anders during the course of the criminal investigation; in particular, the record shows that the investigation stalled until Leopold-Leventhal "used [Judge Page's] name . . . with Detective Anders," (E-Mail from Leopold-Leventhal to Page, Dec. 4, 2008, Pl.'s App. at 720), and that the

investigation thereafter resumed, resulting in Logan's arrest.  A
jury drawing reasonable inferences in the Plaintiffs' favor could
conclude that Detective Anders shared Salem's improper purpose
for the criminal proceedings.  Summary judgment is not proper.[36]

      4.  Civil Conspiracy

      "The essential elements of a claim for civil conspiracy are:
(1) a combination of two or more persons acting with a common
purpose to do an unlawful act or to do a lawful act by unlawful
means or for an unlawful purpose; (2) an overt act done in
pursuance of the common purpose; and, (3) actual legal damage. .
. .  Proof of malice, or an intent to injure, is also an
essential part of a cause of action for conspiracy."
Commonwealth v. TAP Pharmaceutical Prods., Inc., 36 A.3d 1112,
1144 (Pa. Commw. Ct. 2011).  Detective Anders argues that she is
entitled to summary judgment on this claim because she acted
lawfully during the criminal investigation and because
insufficient evidence of malice exists.  For the same reasons
triable issues exist as to the § 1983 false arrest and abuse of
process claims, triable issues exist about whether Detective
Anders acted unlawfully for purposes of this claim.  Similarly,

---

      [36] The same evidence precludes Detective Anders from entitlement to
summary judgment based on governmental immunity because genuine factual
disputes exist about whether her conduct constituted "willful misconduct"
within the meaning of 42 Pa. Cons. Stat. § 8550.  See Jones v. City of Phila.,
893 A.2d 837, 843-44 (Pa. Commw. Ct. 2006).

the same evidence which creates triable issues about whether
Detective Anders used legal process for an improper purpose also
creates triable issues about whether she acted with the requisite
malice.  Summary judgment on this claim is not proper.

B.  District Attorney Ferman

As relevant to DA Ferman, the Plaintiffs assert claims for:
(1) § 1983 false public statements, (2) abuse of process, (3)
civil conspiracy, (4) defamation, (5) false light invasion of
privacy, and (6) commercial disparagement.  Triable issues exist
only as to the § 1983 claim, so summary judgment is proper in DA
Ferman's favor on the state law claims but not on the § 1983
claim.

1.  § 1983 False Public Statements

"[A]n individual does not have a protected due process
interest in reputation alone."  Thomas v. Independence Twp., 463
F.3d 285, 297 (3d Cir. 2006).  To succeed on a "due process claim
for deprivation of a liberty interest in reputation, a plaintiff
must show a stigma to his reputation plus deprivation of some
additional right or interest."  Dee v. Borough of Dunmore, 549
F.3d 225, 233-34 (3d Cir. 2008) (internal quotations omitted)
(emphasis original).  A plaintiff may establish such a
deprivation by showing "that the alleged harassment remove[d] or
significantly alter[ed] plaintiffs' liberty and property

interests in their business." <u>Thomas</u>, 463 F.3d at 297. (internal quotations omitted).

DA Ferman argues that summary judgment is proper on this claim because no evidence establishes that DA Ferman's public statements interfered with Logan's constitutionally protected right to carry on his trade or business. We conclude that sufficient evidence exists for a jury to conclude that DA Ferman's public statements significantly altered Logan's ability to pursue his construction business. Logan testified about several long-term lucrative construction contracts which his companies did not receive because of the publicity surrounding the criminal proceedings, (Logan Dep. at 38:24-56:20, 72:12-79:14, Pl.'s App. at 257-61, 265-67), or which could not go forward because of Logan's inability to access credit as a result of such publicity, <u>id.</u> at 57:1-72:1. Logan also testified that Delta no longer performs construction services at all. (<u>See</u> Logan Dep. at 9:12-13:4, Pl.'s App. at 250-51.) A jury crediting this testimony could conclude that DA Ferman's public statements adequately altered the Plaintiffs' ability to pursue construction business for liability to attach on this theory. Summary judgment is not proper.

2.  State law claims

In Pennsylvania, "[i]t has long been held that high public officials are immune from suits seeking damages for actions taken or statements made in the course of their official duties." Durham v. McElynn, 565 Pa. 163, 165, 772 A.2d 68 (2001). Specifically, a prosecutor's public statement about a pending matter is sufficiently "closely related" to the performance of the prosecutor's official duties as to fall within this absolute immunity. McCormick v. Specter, 220 Pa. Super. 19, 21-22, 275 A.2d 688 (1971). Legal proceedings certainly fall within the scope of this absolute immunity. See id.

Here, the Plaintiffs concede that absolute immunity bars the abuse of process claim. Moreover, we conclude that Pennsylvania law cloaks DA Ferman with absolute immunity respecting her statements to the press about this matter. Summary judgment is therefore appropriate on all the Plaintiffs' state law claims against DA Ferman because of her absolute immunity from liability under state law.[37]

C.  Salem

As relevant to Salem, the Plaintiffs assert claims for: (1) malicious prosecution, (2) abuse of process, and (3) civil conspiracy.  Triable issues exist as to all four of Logan's

---

[37]  In contrast, for purposes of the § 1983 claim arising out of DA Ferman's allegedly false public statements, qualified immunity and not absolute immunity applies as a matter of federal law.  See Buckley v. Fitzsimmons, 509 U.S. 259, 277-78 (1993).

claims, but not as to any of TDA LLC's claims.  We therefore grant summary judgment on all of TDA LLC's claims against Salem and deny summary judgment on all of Logan's claims against Salem.

1.  Malicious Prosecution

Salem argues that summary judgment is proper on the malicious prosecution claim because Logan has not presented adequate evidence to warrant a finding that Salem initiated the criminal proceedings, did so without probable cause, or did so with the requisite malice.  See Doherty, 513 F. Supp. 2d at 409; Kelley, 518 Pa. At 521.

First, sufficient evidence exists in the record for a jury to conclude that Salem initiated the criminal proceedings.  "In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false."  Hess v. Lancaster County, 514 A.2d 681, 683 (Pa. Commw. Ct. 1986).

Here, triable issues exist as to the procurement element on both theories.  A jury could conclude that Salem, acting through

its legal counsel,[38] gave materially false and misleading
information to public officials leading to the initiation of
proceedings.  For the same reasons that a juror could conclude
that Detective Anders put materially false and misleading
information in the affidavit of probable cause, a juror could
also conclude that Leopold-Leventhal, as the source of much of
this information, (see Anders Dep. at 175:14-177:19, Pl.'s App.
at 92-93), provided similarly false and misleading information to
Detective Anders, see discussion supra at section III.A.1.a.
Drawing inferences in the Plaintiff's favor, this record would
also permit a reasonable jury to conclude that the requests of
Salem and its legal counsel were the determining factor in the
initiation of criminal proceedings. (See, e.g., E-Mail from
Leopold-Leventhal to Page, Jonas, and Caum, Dec. 4, 2008, Pl.'s
App. at 720 ("I only used [Judge Page's] name in the softest way

---

[38] Salem unambiguously authorized its legal counsel to pursue the
initiation of criminal proceedings against Logan and Mack.  (E-Mail from Page
to Leopold-Leventhal, May 8, 2008, Pl.'s App. at 710.)  Salem also ratified
its legal counsel's conduct upon receiving updates about its legal counsel's
efforts to further this strategy and ratifying such efforts by acquiescence.
(See E-Mail from Leopold-Leventhal to Page, July 14, 2008, Pl.'s App. at 719;
E-Mail from Leopold-Leventhal to Page, Jonas, and Caum, Dec. 4, 2008, Pl.'s
App. at 720; E-Mail from Leopold-Leventhal to Page, Jonas, and Caum, Jan. 12,
2009, Pl.'s App. at 722.)  As a result, the acts of its legal counsel impute
to Salem for purposes of establishing Salem's liability to the Plaintiffs
here.  See Computer Aid, Inc. v. Hewlett-Packard Co., 56 F. Supp. 2d 526, 538
(E.D. Pa. 1999); Restatement 2d of Agency § 253 ("A principal who authorizes a
servant or other agent to institute or conduct such legal proceedings as in
his judgment are lawful and desirable for the protection of the principal's
interests is subject to liability to a person against whom proceedings
reasonably adapted to accomplish the principal's purposes are tortiously
brought by the agent."); see also Aiello v. Ed Saxe Real Estate, Inc., 508 Pa.
553, 559, 499 A.2d 282 (1985).

possible with Detective Anders.  It was effective, let's leave it
at that."); E-Mail from Sander to Ferman, Jan. 13, 2009, Pl.'s
App. at 236 ("[Sander] found out [on January 13] that the Salem
Baptist Church would have to put up $30,000 for arbitration
unless we made arrests against the princip[al]s of the Delta
Organization before Thursday [January 15, 2009] so we decided to
do it tomorrow.").)  Summary judgment is improper on this basis.

Second, we conclude that the arbitrator has already answered
the relevant factual questions so as to permit us to conclude, at
this stage, that Salem had no probable cause to institute the
criminal proceedings against Logan.[39]  Among other conclusions,

---

[39] Federal courts give judgments the same preclusive effect as the
rendering court would.  See 28 U.S.C. § 1738.  Pennsylvania law grants
preclusive effect to judicially confirmed arbitration awards if the award
otherwise meets the Pennsylvania collateral estoppel standard.  See Frog,
Switch & Mfg. Co. v. Pa. Human Relations Comm'n, 885 A.2d 655, 661 (Pa. Commw.
Ct. 2005).  In Pennsylvania, "[a] plea of collateral estoppel is valid if, 1)
the issue decided in the prior adjudication was identical with the one
presented in the later action, 2) there was a final judgment on the merits, 3)
the party against whom the plea is asserted was a party or in privity with a
party to the prior adjudication, 4) the party against whom it is asserted has
had a full and fair opportunity to litigate the issue in question in a prior
action."  Shaffer v. Smith, 543 Pa. 526, 529, 673 A.2d 872 (1996) (quotations
omitted).  Pennsylvania also permits non-mutual application of collateral
estoppel.  See id.  And collateral estoppel may apply to "all relevant issues
of fact that were actually raised in the prior litigation," even "[w]here the
cause of action in a pending suit is not identical with that previously
litigated."  McCandless Twp. v. McCarthy, 7 Pa. Commw. 611, 619-20, 300 A.2d
815 (1973) (quotations omitted).
    We may reach such a conclusion as to the preclusive effect of the
factual determinations in the arbitration award sua sponte.  See United States
v. Five Unlabeled Boxes, 572 F.3d 169, 175 (3d Cir. 2009) (citing Arizona v.
California, 530 U.S. 392, 412 (2000)) (sua sponte application of preclusion
proper in special circumstances).  Given the substantial resources that the
parties, the state courts, the United States Bankruptcy Court for the Eastern
District of Pennsylvania, and this Court have expended in adjudicating the
disputes arising out of Salem's conduct, sufficient special circumstances
exist here to justify raising this doctrine sua sponte in order to avoid
wasting scarce judicial resources.  See Arizona, 530 U.S. at 412-13.

the arbitrator determined, after a full and fair hearing on the underlying contractual dispute, that Salem had no legal or factual basis to conclude that Delta had breached its contract with Salem or any of its contracts with the purportedly unpaid subcontractors.  (Arbitrator's Award at 5, Pl.'s App. at 694.) Moreover, the arbitrator concluded that, upon submitting AIA Applications bearing the architect's certification, "[p]ayment was clearly due . . . [and] . . . [Salem] had no claim to the funds. . . .  [Salem] had an obligation to pay; it failed to do so, and failed to fundamentally follow its own rules with regard to payments of funds that it acknowledged it owed to someone and the architect had certified as due."  Id. at 12 n.17.  Treating these facts as established, we conclude that Salem lacked probable cause to initiate the criminal proceedings.

Salem, citing to Kelley v. General Teamsters, Chauffeurs, and Helpers, Local Union 249, 518 Pa. 517, 544 A.2d 940 (1988), argues that its good faith reliance on the advice of its counsel compels the conclusion that it acted with probable cause.  Salem never pleaded this affirmative defense or raised it as part of a cross-claim against its legal counsel, (see Salem Ans. ¶¶ 221-

---

To the extent that Salem wishes to challenge this conclusion about the applicability of collateral estoppel prior to trial, it may file a motion for leave to do so.  But for purposes of resolving this motion, we conclude that, even if the arbitrator's award lacked preclusive effect as against Salem, we would still consider its conclusions as evidence disclosing triable issues of fact on the Plaintiffs' malicious prosecution claim against Salem.

241), and asserted that the attorney-client privilege prevented discovery of certain communications between Salem and its legal counsel, (Page Dep. at 27:8-28:18, 29:7-10, 29:23-25, 30:3-7, 31:13-17, 47:16-19, 51:6-10, Pl.'s App. at 560-61, 565-66). Salem has therefore intentionally adopted contradictory positions to the Plaintiffs' prejudice and may not now reverse its position to assert the defense of reliance on advice of counsel.[40]  See Barrick v. Holy Spirit Hosp. of the Sisters of Christian Charity, 32 A.3d 800, 812 (Pa. Commw. Ct. 2011) (quoting Pa. R. Civ. P. 4003.3) ("A defendant may not base his defense upon an opinion of counsel and at the same time claim that it is immune from pre-trial disclosure to the plaintiff."); see also Yong Wong Park v. Atty. Gen. of U.S., 472 F.3d 66, 73 (3d Cir. 2006) ("[A]sserting inconsistent positions does not trigger the application of judicial estoppel unless intentional self-contradiction is used as a means of obtaining unfair advantage.") (internal quotations omitted).  Salem may not now raise its reliance on the advice of counsel as a basis for summary judgment in its favor, so we deny summary judgment on this basis.

---

[40] Even if we concluded that Salem could raise this defense, we would conclude that the record presents triable issues as to whether it acted in good faith in seeking counsel's advice and whether it made full and complete disclosure of the facts to counsel.  See Kelley, 518 Pa. at 522.

Third, because Salem lacked probable cause to initiate the criminal proceedings, a jury could infer that Salem acted with malice.  See Kelley, 518 Pa. at 521.  Summary judgment is inappropriate on the malicious prosecution claim.

2.  Civil Conspiracy

Salem argues that it is entitled to summary judgment on Logan's civil conspiracy claim because (1) no triable issues exist about whether Salem acted lawfully, (2) no evidence of malice exists, and (3) the intra-corporate conspiracy doctrine precludes liability for Salem based on a conspiracy with its legal counsel.  None of these arguments persuades.

First, for the reasons discussed above, triable issues exist as to Logan's malicious prosecution claim, so triable issues exist about whether Salem acted unlawfully in concert with others for purposes of the civil conspiracy claim.  Second, this record would permit a jury to conclude that Salem acted with malice; the jury could conclude that Salem, acting through its legal counsel, created the strategy of approaching the Montgomery County District Attorney's Office not for purposes of bringing Logan and Mack to justice but, instead, to use criminal proceedings "as leverage for settlement of a judgment," (E-Mail from Caum to Leopold-Leventhal, Mar. 26, 2008, Pl.'s App. at 708; see also E-Mail from Page to Leopold-Leventhal, May 8, 2008, Pl.'s App. at

710), as well as to avoid incurring fees associated with
defending against Delta's arbitration claim, (E-Mail from Sander
to Ferman, Jan. 13, 2009, Pl.'s App. at 236).  Finally, whatever
the limitations on Salem's liability for an unlawful combination
with its legal counsel, sufficient evidence exists for a jury to
conclude that Salem, on its own and through its legal counsel,
acted unlawfully in combination with Detective Anders and DA
Ferman.  See discussion supra at section III.A.4. (Detective
Anders), section III.B.3 (DA Ferman).

　　　3.  Noerr-Pennington Doctrine

　　　Salem asserts that the Noerr-Pennington doctrine shields it
from liability for malicious prosecution and civil conspiracy.
See Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 159 (3d
Cir. 2001) (applying Noerr-Pennington doctrine to civil
conspiracy claim); Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d
119, 128-29 (3d Cir. 1999) (applying Noerr-Pennington doctrine to
malicious prosecution claim).  Although the Noerr-Pennington
doctrine precludes liability for exercising the First Amendment
right to petition the government, including the judiciary through
litigation, it does not extend to "sham" litigation.  See
Professional Real Estate Investors, Inc. v. Columbia Pictures
Industries, Inc. (PRE), 508 U.S. 49, 60-61 (1993).  The sham
exception applies when "[1] the lawsuit [is] objectively baseless

in the sense that no reasonable litigant could realistically expect success on the merits . . . . [and] . . . [2] the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor." Id. (internal quotations omitted).  Courts refer to these two tests as the objective prong and subjective prong of the sham exception.  In re Flonase Antitrust Litig. (Flonase), 795 F. Supp. 2d 300, 309-310 & n.11 (E.D. Pa. 2011).  "The question whether the petition is a sham is generally a question of fact for the jury[.]" Id. at 310 (internal quotations omitted).

Here, because we conclude that Salem lacked probable cause to initiate the criminal proceedings, it follows that the attempt to bring criminal proceedings was objectively baseless for purposes of invoking the sham exception.  See PRE, 508 U.S. at 62-63.  And the record contains sufficient evidence for a jury to conclude that, by bringing the criminal proceedings, Salem intended to use them "as leverage for settlement of a judgment," (E-Mail from Caum to Leopold-Leventhal, Mar. 26, 2008, Pl.'s App. at 708), and otherwise to its favor in the arbitration proceedings, (E-Mail from Leopold-Leventhal to Page, Jonas, and Caum, Jan. 12, 2009, Pl.'S App. at 722 ("[W]e have to wait and see how [the arrests of Logan and Mack] impact[] our civil case, but this is good!")).  This evidence would therefore permit a

jury to conclude that Salem's attempt to initiate criminal proceedings "were not really efforts to vindicate its rights in court."[41]   See Teva Pharmaceuticals USA, Inc. v. Abbott Laboratories, 580 F. Supp. 2d 345, 362 (D. Del. 2008).   Summary judgment based on the Noerr-Pennington defense is inappropriate.

    4.   Propriety of TDA LLC as a Party

    Finally, Salem argues that summary judgment is warranted on all claims which TDA LLC asserts because it is not a real party in interest in this matter, having come into existence after the formation of the October 2003 Contract and having not performed any work on the project.   The Plaintiffs offer no argument in response, and we see no evidence in the record which might create a triable issue on any of the claims which TDA LLC asserts against Salem.   Summary judgment is therefore proper on TDA LLC's claims against Salem.

**IV.   CONCLUSION**

    For these reasons, the Motion of Anders and Ferman is granted with respect to the state law claims against DA Ferman

---

[41] Even without this clear evidence from which a jury could easily conclude that Salem's improper motives for its attempt to initiate criminal proceedings satisfy the subjective prong of the sham exception test, we would conclude that the objective baselessness of the criminal proceedings would permit a jury to infer the requisite subjective intent and thereby invoke the sham exception.   See Flonase, 795 F. Supp. 2d at 309-17 (considering only whether sufficient evidence exists for a jury to conclude that objective prong of Noerr-Pennington sham exception applied in denying summary judgment based on Noerr-Pennington defense); cf. Kelley, 518 Pa. at 521 (absence of probable cause permits inference of malice in malicious prosecution action).

and denied in all other respects, and the Motion of Salem is granted with respect to all claims asserted by TDA LLC and denied in all other respects.  An appropriate order follows.